J-S03037-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| EDWARD DAMIAN STEWART | : | |
| | : | |
| Appellant | : | No. 847 WDA 2021 |

Appeal from the PCRA Order Entered July 20, 2021
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0007235-2016

BEFORE:  LAZARUS, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED: MARCH 8, 2022**

Edward Damian Stewart (Stewart) appeals the order of the Court of Common Pleas of Allegheny County (PCRA court) denying his petition for post-conviction relief.[1]  In 2017, Stewart was found guilty after a jury trial of the following counts:  rape of a child, involuntary deviate sexual intercourse with a child, unlawful contact with a minor, indecent assault against a person under the age of 13, endangering the welfare of children, and corruption of a minor. He was sentenced to an aggregate prison term of 16.5 to 33 years.  On appeal,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Stewart's ineffectiveness claims were raised pursuant to the Post-Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.

Stewart argues that the PCRA court erred in finding that his claims of ineffective assistance of trial counsel have no merit. We affirm.

**I.**

The underlying facts are gleaned from the certified record. In 2012, Stewart began residing with his romantic partner, T.H., whose oldest daughter at the time, K.W., was 11 years old. Shortly after the relationship between Stewart and T.H. ended in 2015, K.W. confided to a therapist and to her great-grandmother (B.H.) that Stewart had sexually abused her. The allegations against Stewart were then passed on to the police and the Commonwealth filed criminal charges.

At a jury trial in 2017, a number of witnesses testified, including K.W.; T.H.; B.H.; Detective Daniel Honan, an investigating officer; and Jamie Mesar, a qualified expert in the fields of child welfare and child sexual abuse. The central allegation was that from 2012 to 2015, when K.W. was 11 to 14 years old, Stewart would force her into oral, vaginal and anal intercourse. These episodes would usually take place when K.W.'s mother was working night shifts as a hospital nurse.

K.W. testified that Stewart threatened to kill her if she told anyone what had happened. *See* Trial Transcript, 2/13/2017, at p. 91. She also recalled that Stewart had once prefaced a sexual encounter with a particular phrase:

> Commonwealth: Other than [Stewart] saying that he wanted to be with you at [your mother's house on Dersam Street], did he ever say anything else to you when these things were happening? I can ask that a different way if that would help.

K.W.:  I don't remember.

Commonwealth:  I'm sorry, can you say that again?

K.W.:  I don't remember.

Commonwealth:  Did he ever say anything to you before these things would happen?  Do you remember if he would say anything to you before these things would happen at Dersam?

K.W.:  Yes.

**Commonwealth:  What would he say?**

**K.W.:  "You know the routine."**

Commonwealth:  Okay.  And what did that mean to you?

K.W.:  Like I already knew what was going to happen.

Commonwealth:  And did he say that to you at Dersam one time or more than one time?

K.W.:  One time.

Commonwealth:  I'm sorry?

K.W.:  One time.

Trial Transcript, 2/13/2017, at pp. 99-100 (emphasis added).

The above testimony coincided with that of her great-grandmother, B.H., who described at trial how K.W. had disclosed the abuse to her:

Commonwealth:  During the course of your walk [with K.W.], did [K.W.] say anything to you about Edward Stewart?

B.H.:  At first she didn't.  We was walking, and she didn't say at first, and then she came over to me and she said, "Grandma," she said, "I told [my therapist] that [Stewart] put his hands on me." And I stated, "Did he hit you?"  And she said, "No, not in that way."

Commonwealth:  What happened after she said that?

B.H.:  After she said that, I told -- I said, "Sexually, [K.W.]?"  She said, "Yes."  I said, "Well, I'll tell you what, before you tell me anything else, I don't want you to repeat it again."

So I told her to wait until we all get back in the house, and when we all get back in the house, everybody that was in the house, I just want you to tell us all at the same time so you won't have to tell me and then repeat it to them.

Commonwealth:  So you had like a family meeting when you got home?

B.H.:  Right, when we went back in the house.

Commonwealth:  And after this family meeting, did she then explain what she meant during this family meeting?

B.H.:  Yes.  At first she was hesitant and she was kind of drawn back, and then we just told her go ahead, you know, just tell us what happened, **and then after we told her to tell us what happened, she said that [Stewart] made her take all of her clothes off, and he told her, "You know what to do," and everything and all.**

So at that point, we just all broke down, you know, and there wasn't nothing else stated until we – I called her therapist, and I told her she has to come in.

Trial Transcript, 2/13/2017, at pp. 73-75 (emphasis added).

Once K.W.'s allegations were passed on to the police, the case was assigned to Detective Honan.  The officer testified at trial that he had interviewed K.W. about two weeks after the alleged abuse had first been reported.  As to the content of the interview with K.W., Detective Honan testified generally that the child had "disclosed to [him] that Edward Stewart had sexually assaulted her on multiple occasions at multiple locations over like

- 4 -

a three-year period." Trial Transcript, 2/13/2017, at p. 160. The officer went forward with the filing of charges against Stewart based on what K.W. had told him.

K.W. was also interviewed by Mesar, who worked as a case manager for UPMC Children's Hospital Child Advocacy Center. In this role, Mesar would speak with potential child victims of abuse to gather information and assess their behavioral responses. Mesar's qualifications as an expert in the field of "child sexual abuse, victim disclosure and behavior" were never disputed.

While on the stand, Mesar testified at length about child victims' memories of abuse:

> Commonwealth: And have you had any experience with the topic of memory of the victim as it pertains to behavior after disclosure?
>
> Mesar: In regards to behavior after disclosure did you say?
>
> Commonwealth: Yes.
>
> Mesar: So, yes. So looking at memory, so we all store our memories different in our minds. Some of us remember the things that are very important to us based on dates and that's how we remember it. Where some people remember specifically to the event: -- where it was, what was going on, and then there are some things that we just block out in our memory.
>
> We can't recall those things, and partially that's a coping mechanism. Or we don't remember them in details. Especially when things are done -- if you even think about your daily life, if someone were to ask you to tell you about something that you do every day, like brush your teeth, you probably wouldn't remember the exact details if it occurs the same way each time because your memory doesn't store that way.
>
> So for kids, behavior after disclosure, like they may tell us they don't remember and people think that it's, you know, a coping

mechanism for kids not to disclose or not to make a statement, but truly they may not remember the event based on all of those things.

Commonwealth: And I'm going to ask you a hypothetical question now. If a victim of sexual abuse as a child, a female who was approximately age 11 or 12 when the abuse began, approximately age 14 when she disclosed, if she would when recalling those incidents not be able to remember the exact number of times she was anally raped or vaginally raped or forced to perform oral sex, would that sound any sort of alarm to you?

Mesar: No, it wouldn't sound an alarm. As I said, we don't necessarily recall numbers of times. Like I can't tell you how many times I've gone to the store in a week *per se*, but I know that I have gone there. I can maybe tell you what I bought there because those are the things that were important at that time. So for a child, they may talk about their disclosure in regards to the acts because that's when they remember, possibly because it was painful, possibly because it was something new that occurred, and that's how their brain has stored it, and they may want to recall those numbers of times, but they just can't do it.

*Id.* at pp. 147-49.

Mesar's testimony was relevant because the defense's theory of innocence at trial was that K.W. had falsely accused Stewart to take revenge on him for breaking up with her mother.[2] The jury's verdict, therefore, hinged on whether it found K.W. credible. The jury was properly instructed that it could make that credibility determination based on the content of K.W.'s allegations and the circumstances in which they came to light.

_____

[2] Mesar also conducted a forensic interview with K.W. and testified to those facts, but that portion of the testimony is not at issue in the present appeal.

At the conclusion of the trial, Stewart was found guilty of six offenses and he was sentenced to an aggregate prison term of 16.5 to 33 years. Stewart's post-sentence motions were denied, and he did not timely file a direct appeal. A direct appeal *nunc pro tunc* was granted, and this Court affirmed the judgment of sentence in **Commonwealth v. Stewart**, 1877 WDA 2017 (Pa. Super. March 5, 2019) (unpublished memorandum).

Stewart timely filed a *pro se* post-conviction petition in 2020, and he was appointed PCRA counsel who filed an amended petition on his behalf. **See** Amended PCRA Petition, 9/6/2020. In this amended petition, Stewart asserted that his trial counsel had been ineffective in failing to object to inadmissible hearsay and prior inconsistent statements introduced through the testimony of B.H. and Detective Honan. Stewart maintained that the statements K.W. made to those witnesses were used to improperly bolster K.W.'s credibility.

The second of Stewart's two ineffectiveness claims was that his trial counsel failed to object to Mesar's testimony concerning how victims of child abuse form and recall memories of their experiences. Stewart relied on the limited scope of 42 Pa.C.S. § 5920, which permits expert witnesses to opine on "specific types of victim responses and victim behaviors." Under Stewart's interpretation of that statute, Mesar's discussion of memory did not relate to a victim's "response" or "behavior," and his trial counsel performed ineffectively by not challenging the admissibility of such testimony.

The PCRA court summarily denied Stewart's ineffectiveness claims, finding that they have no underlying merit. As to the hearsay/prior consistent statement claim, the PCRA court found that trial counsel could not have been ineffective in failing to object because the subject testimony was not hearsay, as it was admitted for a purpose other than to prove the truth of the matter asserted. As to Mesar's disputed testimony, the PCRA court likewise found that an objection would have been futile because the witness had testified within the scope of the applicable evidentiary rules.[3]

Stewart now raises two appellate issues for our consideration:

1. Was trial counsel ineffective in failing to object to hearsay testimony that further acted as prior consistent statements of the complainant, which would have the natural impact of improperly bolstering the complainant's credibility?

2. Was trial counsel ineffective in failing to object to portions of expert witness Jamie Mesar's testimony that went beyond the scope of the authorization provided by 42 Pa.C.S. § 5920(b)(2)?

_____

[3] The PCRA court presented the reasons for its ruling in a Rule 907 Notice of Intent to Dismiss Stewart's petition for post-conviction relief. **See** Rule 907 Notice, 6/16/2021 at 1-4; **see also** Pa.R.Crim.P. 907 (outlining procedure for dismissing a PCRA petition without a hearing). The PCRA court permissibly relied on this notice *in lieu* of entering a separate 1925(a) opinion. **See** PCRA Court Order, 7/20/2021, at 1; Pa.R.A.P. 1925(a)(1) (a separate opinion setting forth reasons for the appealed order is not necessary if the appellate court has been directed to the place in the record where those reasons may be found).

J-S03037-22

Appellant's Brief, at 3.[4]

## II.

Stewart's first ineffectiveness claim concerns the testimony of B.H. and Detective Honan. Specifically, Stewart contends that his trial counsel was ineffective in failing to object to portions of their testimony relaying K.W.'s out-of-court statements, especially her claim that Stewart once told her, "You know what to do," suggesting a long-term pattern of sexual abuse. Stewart categorizes the statements of these witnesses as hearsay and prior consistent statements which would have been excluded from the evidence at trial had his counsel timely objected to them.

"To prevail on a claim of ineffective assistance of counsel, a petitioner must overcome the presumption that counsel is effective by establishing [by a preponderance of the evidence] all of the following three elements: (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness." ***Commonwealth v. Chmiel***, 30 A.3d 1111, 1127–28 (Pa. 2011) (citing ***Commonwealth v. Pierce***, 527 A.2d 973, 975-76 (Pa. 1987)). "Counsel cannot be found ineffective for failing to pursue

---

[4] This Court must affirm an order denying PCRA relief as long as the order is supported by evidence in the certified record and free of legal error. ***See Commonwealth v. Halley***, 870 A.2d 795, 799 n.2 (Pa. 2005).

a baseless or meritless claim." ***Commonwealth v. Poplawski***, 852 A.2d 323, 327 (Pa. Super. 2004).

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered "in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). "Hearsay testimony is ***per se*** inadmissible in this Commonwealth, except as provided in the Pennsylvania Rules of Evidence, by other rules prescribed by the Pennsylvania Supreme Court, or by statute." ***Commonwealth v. Cunningham***, 805 A.2d 566, 572 (Pa. Super. 2002).

However, "evidence that would constitute inadmissible hearsay if offered for one purpose may be admitted for another purpose[.]" ***Commonwealth v. Underwood***, 500 A.2d 820, 822 (Pa. Super. 1985). For example, "an out-of-court statement offered to explain a course of conduct is not hearsay." ***Commonwealth v. Cruz***, 414 A.2d 1032, 1035 (Pa. 1980). "[C]ertain out-of-court statements offered to explain the course of police conduct are admissible on the basis that they are offered not for the truth of the matters asserted but rather to show the information upon which police acted." ***Commonwealth v. Jones***, 658 A.2d 746, 751 (Pa. 1995).

Similarly, while the hearsay rule would preclude a prior consistent statement from being used as substantive evidence, such a statement may be admissible "as rebuttal or rehabilitation." ***Commonwealth v. Bond***, 190 A.3d 664, 668 (Pa. Super. 2018). To be used in this manner, "the opposing

party [must be] given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of . . . fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose[.]" Pa.R.E. 613(c)(1).

In the present case, we find that Stewart's trial counsel could not have been ineffective because the underlying legal claim has no arguable merit. Although the disputed testimony would not be admissible as prior inconsistent statements,[5] B.H. and Detective Honan both briefly recounted what K.W. said in order to explain their own courses of conduct. This was relevant because K.W. came forward about three years after the abuse had begun, and Stewart's defense was that the child had fabricated the accusations to retaliate against Stewart for breaking up with K.W.'s mother. What the child told these witnesses and how she told them was introduced to establish the timeline of events, not the truth of the matter asserted. Accordingly, the testimony was

---

[5] At trial, Stewart asserted that K.W.'s motive to fabricate her accusations stemmed from his decision to break up with K.W.'s mother. Since that motive preceded the statements, they would not serve as rehabilitation or rebuttal evidence for the purposes of Pa.R.E. 613(c)(1), which would require the statements to be made "before that which has been charged existed or arose[.]"

not inadmissible hearsay. *See Commonwealth v. Rega*, 933 A.2d 997, 1017 (Pa. 2007).[6]

Further, both witnesses, as well as K.W., were available for cross-examination. Neither B.H. nor Detective Honan vouched for K.W.'s credibility or otherwise suggested that the events described by K.W. actually occurred merely because the child said they did.[7] Under the circumstances, there was no meritorious basis on which trial counsel could have objected to the subject portions of the witnesses' testimony. Thus, the PCRA court did not err in ruling that there is no legal merit to the underlying claim of ineffectiveness.

---

[6] As to testimony relaying to K.W.'s claim that Stewart said, "You know what to do," shortly before an episode of sexual abuse occurred, the statement is not hearsay. Whether K.W., in fact, "knew what to do" has little to no relevance in this case. The statement is significant, rather, because of its subtext. There would have been an implicit understanding between the speaker and the listener that something was about to happen that had happened regularly before. The statement was, therefore, admissible and probative as to whether K.W. had been subjected to years of sexual abuse as she had alleged.

[7] Stewart argues in his brief that B.H.'s reiteration of the phrase, "You know what to do," was especially prejudicial because the prosecutor repeated the line to the jury, using it to demonize Stewart and improperly bolster K.W.'s credibility. However, the underlying merit of the ineffectiveness claim concerns whether trial counsel failed to object to testimony that was, as a matter of law, inadmissible. Once admitted, the prosecutor had wide latitude in commenting on the evidence to the jury. *See e.g., Commonwealth v. Spotz*, 18 A.3d 244, 288 (Pa. 2011) ("A prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments"). The prosecutor's comment on the evidence had no retroactive bearing on whether that evidence was admissible in the first place.

**III.**

Stewart's second ineffectiveness claim is that his counsel failed to object to improper testimony by the Commonwealth's expert witness, Jamie Mesar. According to Stewart, this testimony went beyond the permissible scope of 42 Pa.C.S. § 5920(b)(2), which governs the qualifications and use of experts in certain criminal proceedings, including those relating to sexual abuse. Again, as with Stewart's first asserted ground of ineffectiveness, we find that the PCRA court did not err because there is no merit to the underlying legal claim.

Section 5920(b)(2) allows a qualified expert to opine on "types of victim responses and victim behaviors." 42 Pa.C.S. § 5920(b)(2). Conversely, the statute prohibits experts from giving an "opinion regarding the credibility of any other witness, including the victim[.]" *Id.* at § 5920(b)(3). The stated use of experts under the statute is to "assist the trier of fact in understanding the dynamics of sexual violence or domestic violence, victim responses to sexual violence or domestic violence and the impact of sexual violence or domestic violence on victims during and after being assaulted." *Id.* at § 5920(b)(1).

In this case, the Commonwealth elicited testimony from a qualified expert, Mesar, concerning how victims of sexual abuse might create, store and access memories of those events. Mesar explained in pertinent part that the development and accessibility of traumatic memories can vary to a broad extent, causing some victims to delay their reporting of those events or even

- 13 -

forget them entirely. Stewart argues that such testimony goes beyond the permissible scope of Section 5920(b)(1) because memory function is not the type of "response" or "behavior" that is contemplated by the law.

However, the record shows that the substance of Mesar's disputed testimony was that victims can respond or behave in a variety of different ways after being sexually assaulted. She relied on her expertise to explain, hypothetically, why a victim might report instances of abuse either immediately or long after their occurrence, depending on a host of psychological factors. We find nothing in the language of Section 5920(b)(1) or in any other relevant authority suggesting that such reasons for the timing of a victim's reporting of abuse cannot be discussed by a qualified expert in that field.

We note further that Mesar did not opine specifically on K.W.'s credibility, presume to know what happened in K.W.'s case, or otherwise invade the province of the jury. As the jury necessarily had to assess the credibility of allegations lodged years after the fact, Mesar's testimony would have been a valid consideration falling squarely within the scope of Section 5920(b)(1). **See generally Commonwealth v. Carter**, 111 A.3d 1221, 1223 (Pa. Super. 2015) (holding that expert's testimony was "clearly admissible" because the witness had "expounded upon some of the reasons why a child sexual abuse victim may delay in reporting" but did "not testify regarding this victim specifically or whether or not the alleged incidents

actually occurred" nor "offer any opinion regarding the victim's credibility."). Thus, Stewart's trial counsel could not have been ineffective for failing to object to such testimony, and the order denying his amended PCRA petition must stand.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/08/2022